IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

EUGENE NICHOLAS, *et al.*

                Plaintiffs,

v.

JEFFREY SNIDER, *et al.*,

                Defendants.

Civil Action No.:
4:18-cv-01631-MWB

(Hon. Matthew W. Brann)

---

## DEFENDANTS' BRIEF IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

CAV Farms, Inc. was, until mid-August 2017, the exclusive supplier of grass fed beef to Fresh Direct, LLC. CAV Farms was required to ship at least 80 head every three weeks to Fresh Direct's meat processing plant. To meet this schedule CAV Farms, Inc. maintained a herd of about 1,000 head of cattle. As cattle from the herd were finished according to the requirements of Fresh Direct, the most suitable cattle for shipping would be selected by Mike Rogers. *See* Affidavit of Jeffrey Snider, sworn to on October 6, 2020, pars. 29, 36, 49.

Mike Rogers, an experienced cattle dealer, also located suitable cattle for inclusion in CAV Farms' herd. When such cattle were located, Mike Rogers would contact Jeff Snider, the principal of CAV Farms, provide him with the characteristics of the cattle and discuss a potential purchase. If Jeff Snider approved of the purchase, Mike Rogers would fund the purchase with his own monies and CAV Farms would promptly reimburse Mike Rogers, or, in some cases, directly pay the farmer who sold the cattle. Snider Aff. pars. 19, 52.

Mike Rogers had no authority to purchase cattle for CAV Farms' herd without the prior approval of Jeff Snider; and Mike Rogers had no authority to purchase cattle for CAV Farms on credit. Snider Aff. pars. 48.

Mike Rogers on several occasions represented to Jeff Snider he had acquired cattle for CAV Farms when, in fact, he had not. He was paid by CAV Farms for the phantom cattle and then reported to CAV Farms the ear tag serial numbers he had assigned to the non-existent head. Snider Aff. pars. 21, 67.

Of course, Mike Rogers' phantom cattle could not be used to meet CAV Farms' supply obligation to Fresh Direct. Mike Rogers, therefore, to mask his fraud from CAV Farms began purchasing cattle from the plaintiffs, on credit and at prices far above market rate. Snider Aff. par. 21.

Believing that the program for which Mike Rogers was buying cattle was limited to cattle having a New York origin, the plaintiffs allowed him to remove the tags on their Pennsylvania cattle and retag the cattle with tags showing a New York provenance. For retagging Mike Rogers used the CAV Farms ear tags with serial numbers he had assigned to his phantom cattle. Plaintiff Nicholas, because his payment arrangement with Mike Rogers was based on weight after slaughter (hot hanging weigh), tracked the cattle he sold to Mike Rogers by recording the CAV Farms' ear tag number that was assigned to each of Mr. Nicholas's cattle in the retagging process. Snider Aff. pars. 21, 69.

I

CAV FARMS IS NOT A DEALER

The plaintiffs assert that one or more of the defendants is liable as a dealer under the prompt payment provision of the Packers and Stockyards Act. The defendants are not so liable. A dealer under the Packers and Stockyards Act falls within one of these categories:

a) Packers-buyers who are employed by packing plants to acquire cattle for slaughter;

b) Commission people such as order-buyers; and

c) Speculators who buy in their own name to resell.

Solomon Valley Feedlot, Inc. v. Butz, 557 F.2d 717, 720 (10th Cir 1977). The activities of CAV Farms do not fall within any of those categories.

A distinction must be made "between the one who is regulated because he is engaged in the business in accordance with the statute and one who makes a profit as a result of improving animals." Id. The activities of CAV Farms fell squarely within the latter. CAV Farms purchased cattle not for a speculative resale, but to supply one buyer, Fresh Direct, that offered a firm price, $3.50 per pound of hot hanging weight, for cattle that met its grass-feed beef requirements. CAV Farms purchased cattle to finish--that is, to improve--in order to meet the requirements of the Fresh Direct program. Snider Aff. pars. 24, 42, 38.

Neither CAV Farms nor any of the other defendants qualify as a dealer under the Packers and Stockyards Act. The case cited by the plaintiffs at page 12 of their brief, Abington Livestock Exchange v. Smith, 594 F.Supp.2d 688 (W.D.Va. 2009), is not to the contrary. ("[T]he essence of the defendants' business was buying large quantities of cattle from various sources for resale.") There was no evidence in that case that the defendant was otherwise than a cattle dealer buying and selling on speculation, even though most cattle were held on feed lots prior to resale.

According to the Department of Agriculture's website, unlike dealers, "[f]armers and ranchers are not subject to the Packers and Stockyards Act when buying livestock for their own stocking or feeding purposes, or when marketing their own livestock." https://www.ams.usda.gov/rules-regulations/packers-and-stockyards-act/regulated-entities/faq. At the very least, determining whether CAV Farms operated as a "dealer" or a "farmer" is a factual question. The resolution of that question is not to be decided by summary judgment.[1]

## II

## ROGERS PURCHASED THE PLAINTIFFS' CATTLE OUTSIDE OF HIS AUTHORITY

The plaintiffs claim that Mike Rogers acted within the scope of his authority as agent for CAV Farms when he purchased the cattle that are the subject of this litigation. He was a registered and bonded dealer under the Packers and Stockyards Act. His cattle purchases from the plaintiffs that are the subject of this action as well as the cattle (phantom or real) he acquired for the CAV Farms herd amount to only a small portion of his total dealer activity. To cover the fraud he practiced on CAV Farms, he purchased cattle from the plaintiffs. He did not do so as CAV Farms' agent.

> When an agent abandons the object of his agency and acts for himself by committing a fraud for his own exclusive benefit, he ceases to act within the scope of his employment and to that extent ceases to act as agent.

Henry v. Allen, 151 N.Y. 1, 11, 45 N.E. 355 (N.Y. Ct. of App. 1896).

---

[1] Of course, for liability to attach under the Packers and Stockyards Act, the plaintiffs must first establish that plaintiffs sold cattle to CAV Farms. To establish this they must show that when Mike Rogers purchased the plaintiffs' cattle he did so acting within the scope of his authority as agent of CAV Farms. That is discussed in the section that follows.

Only after the sales were effected did the plaintiffs learn of Mike Rogers' connection with CAV Farms. It was clearly the plaintiffs' decision to sell their cattle to Mike Rogers on credit.

> 'Credit, if given [in the case of an undisclosed principal], is given to the agent. There is no opportunity to deceive the dealer as to his precise authority, for the reason that no agency is claimed. *** If the principal is not disclosed at the time of the contract by the agent, and it is subsequently ascertained that he was acting as agent, then the seller may look either to the principal or agent, but in order to hold the principal under such circumstances, it must be shown that the agent acted *according to his authority,* or that his acts had been subsequently ratified and confirmed.'

Industrial Mfrs., Inc. v. Bangor Mills, Inc., 283 A.D. 113, 117, 126 N.Y.S.2d 508, 512 (N.Y.App.Div. 1st Dept. 1953) (emphasis original) (quoting Liang v. Butler, 34 Hun. 144, 147).

There is no claim here to that the purchases of plaintiffs' cattle, on credit, by Mike Rogers were ratified or confirmed by CAV Farms. Thus, the plaintiffs, in order to pin liability on CAV Farms, must establish that Mike Rogers, when he made the purchases, acted within his authority as the agent of CAV Farms. The authority could be actual and express, actual and implied, or apparent.

> Under general principles of agency, the authority of an agent "is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Restatement (Second) of Agency* (the "*Restatement*") § 7 cmt. a (1958). Such authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act. *See id.* cmt. b.
>
> Apparent authority is "entirely distinct from authority, either express or implied," *id.* § 8 cmt. a, and arises from the "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him," *id.* § 27; *see also Fennell v. TLB Kent Co.,* 865 F.2d 498, 502 (2d Cir.1989). Apparent authority, then, is

5

> normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent. *See Fennell,* 865 F.2d at 502 (collecting cases).

Minskoff v. Am. Exp. Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996).

The plaintiffs do not claim to have relied upon Mike Rogers' apparent authority as an agent of CAV Farms. Indeed, they would be hard pressed to make such an argument because they point to no word or conduct (misleading or not) that was imparted to them by CAV Farms prior to their cattle sales to Mike Rogers.

The plaintiffs claim Mike Rogers had implicit actual authority to purchase and purchase on credit, binding CAV Farms. CAV Farms asserts he did not. This presents an issue of fact that is not properly determined on a summary judgment motion.

> A salesman has implied authority in effectuating a sale to do whatever is necessary according to the usual course of procedure prevailing in the business [citation omitted]. What that procedure is will commonly be a question of fact to be answered by a jury [citation omitted] unless the course of business is so notorious as to become a subject for judicial notice [citation omitted]. Sometimes the jury's answer may be given in the light of everyday experience. This will be so when the transaction is of a type so ordinary and simple that everyday experience may reasonably and safely be accepted as a guide [citation omitted]. Sometimes the quality of the act or the setting of the circumstances may call for proof of what is usual before everyday experience may leap to a conclusion."

Burke v. Bonat 255 N.Y. 226, 230-231 (N.Y. Ct. of App. 1931) (Cardozo, C.J.).

Moreover, had the plaintiffs any inkling that Mike Rogers was acting on behalf of another party, his manifest actions imposed upon them a duty to inquire as to whether, when he purchased on credit, he was acting within the scope of his authority. Certainly, offering to purchase cattle at well over market price and retagging in order to make their Pennsylvania cattle appear to have a

New York provenance should have been warning signals to the plaintiffs that Mike Rogers was on a frolic and detour.

> One who deals with an agent does so at his peril, and must make necessary effort to discover the actual scope of the agent's authority [citation omitted]. A party claiming reliance on an agent's apparent authority must not fail to heed warnings or inconsistent circumstances [citation omitted].

Property Advisory Group, Inc. v. Bevona, 718 F.Supp. 209, 313 (N.D.N.Y. 1989). This presents also a factual issue, not subject to determination on a summary judgment motion.

The comment from the Restatement of Agency cited by the plaintiffs at pages 28-29 of their brief is not applicable at bar. The comment deals with the implied authority of a general buying agent. Mike Rogers' authority was so prescribed that he clearly was not such an agent.[2]

### III

### THE PLAINTIFFS ARE NOT ENTITLED TO EQUITABLE REMEDIES

Plaintiffs alternatively press for two equitable remedies--restitution and promissory estoppel--both founded on the equitable principle of unjust enrichment. Equitable remedies are not handed out at the asking. "The granting of equitable relief lies within the sound discretion of the trial court, so long as that discretion is exercised in accordance with the applicable established precedents." Indyk v. Habib Bank Limited, 694 F.2d 54, 57 (2nd Cir. 1982).

---

[2] A "general agent" under the Restatement is defined as one who is "authorized to conduct a series of transactions involving a continuity of service." Section 3(1) Restatement (Second) Agency. Mike Rogers never had authority to conduct any purchase transactions without the prior authorization of Jeff Snider, much less a series of such transactions.

7

First, the plaintiff's equitable causes of action may not be maintained because the existence of oral purchase and sale contracts precludes plaintiffs' right to recover for the cattle sold, on a theory of unjust enrichment, even though the obligor on those contracts is Mike Rogers.[3] <u>Levin v. Gallery 63 Antiques Corp.</u>, No. 04 Civ. 1504, 2006 WL 2802008, at *19 (S.D.N.Y. Sept. 28, 2006) (Promissory estoppel). <u>Indyk v. Habib Bank Ltd.</u>, 694 F.2d 54, 57 (2nd Cir. 1982) (Restitution).

"The term 'unjust enrichment' is founded upon the equitable principle that a person should not be allowed to enrich himself unjustly at the expense of another. Historically it arose in actions to recover on an implied or quasi-contract. [Citation omitted.] It applies in situations where no legal contract exists, 'but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another. [Citation omitted.]'" <u>Indyk v. Habib Bank Limited</u>, 694 F.2d 54, 57 (2nd Cir. 1982).

> "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter" [citations omitted]. An exception is made for compelling equitable circumstances, such as frustration of performance [citations omitted] which are not present in this case. Even where a plaintiff may seek recovery on alternative theories, he must make an election of remedies at trial [citations omitted] or upon submission of a motion for summary judgment [citation omitted], the grant of which is "'the procedural equivalent of a trial'" [citation omitted].

<u>Unisys Corp. v. Hercules Inc.</u>, 224 A.D.2d 365, 367, 638 N.Y.S.2d 461, 462 (N.Y.App.Div. 1st Dept. 1996). No such compelling circumstances here exist. The plaintiffs may not maintain their claims for unjust enrichment.

---

[3] The plaintiffs commenced a civil action against Michael Rogers in this court immediately prior to the instant action (Case No. 4:18-cv-01630). Mike Rogers has defaulted, but the plaintiffs have declined to prosecute same to judgment.

8

Furthermore, the plaintiffs should be required to pursue their legal remedy against Mike Rogers, because that is an adequate remedy at law. In <u>Brenner v. Heller</u>, 2011 WL 6011786 (<u>In re Lincoln Logs Ltd.</u>) (N.D.N.Y. 2011), affirming an order of the bankruptcy court, the district court held that a creditor was not entitled to the retroactive imposition of a constructive trust on assets marshaled by a bankruptcy trustee because, <u>inter alia</u>, the written agreement for the purchase and sale of the goods provided the plaintiffs (Brenners) with a legal remedy, thus precluding the equitable remedy. The Brenners were required to pursue their legal remedy in bankruptcy; even though clearly the Brenners would not be made whole. This though did not render the Brenners' legal remedy inadequate, rather their remedy was merely imperfect. <u>Id</u>. (citing <u>In re First Central Fin. Corp.</u>, 377 F.3d 209, 213 (2nd Cir. 2004)).[4]

Moreover, at bar, the plaintiffs (likely because higher than market prices were promised by Mike Rogers) sold cattle on credit to Mike Rogers with little if no concern for the security of his repayment obligation. The plaintiffs took no lien on the cattle sold. With no regard for risk, new cattle continued to be shipped on credit when payment was seriously past due for previous deliveries.

In <u>In re Millivision, Inc.</u>, 474 F.3d 4 (1st Cir. 2007), prospective purchasers loaned $500,000 to Millivision on a secured basis in order to avoid Millivision's operational shut down due to a lack of funds. The next day, Millivision's creditors filed an involuntary Chapter 11 bankruptcy petition against it. The bankruptcy filing occurred before the prospective purchasers were able to record a financing statement.

---

[4] Although in November 2017 Mike Rogers filed a petition for bankruptcy relief, the petition was dismissed.

9

Millivision's Chapter 11 trustee sought to avoid the security interest as unperfected. In response, the prospective purchasers made various equitable arguments. The First Circuit held that the prospective purchasers' lack of diligence precluded their claims sounding in equity:

> [W]ith respect to appellants' equitable arguments, the bankruptcy court aptly noted that appellants could have avoided their predicament by the simple expedient of recording (thus perfecting) their security interest in the Millivision assets prior to advancing the $500,000, [citation omitted], particularly in light of Millivision's representation that it was so short on cash that it might need to cease operations "Under long-established principles, petitioner's lack of diligence precludes equity's operation." Quoting Pace v. DiGuglielmo, 544 U.S. 408, 419, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005).

In re Millivision, Inc., 474 F.3d 4, 6 (1st Cir. 2007). The lack of common diligence precludes the plaintiffs from invoking the assistance of equity.

IV

PLAINTIFFS MAY NOT PIERCE
THE CORPORATE VEIL

Because corporate regularity is presumed, courts are hesitant to pierce the corporate veil. Establissement Tomis v. Shearson Hayden Stone, Inc., 459 F.Supp. 1355, 1365 (S.D.N.Y. 1978). Whether the attempt to pierce the veil is made under a theory of "alter ego" or "mere instrumentality" there is no exact formula that determines when a court should act. Each case is unique. Brunswick Corporation v. Waxman, 459 F.Supp. 1222, 1229 (E.D.N.Y. 1978), aff'd 599 F.2d 34 (2nd Cir. 1979). In any event the burden is on the party seeking to pierce. Id.

A determination to pierce the corporate veil of CAV Farms is not justified on plaintiffs' papers. CAV Farms engaged in no fraudulent activities, with respect to the plaintiffs, or otherwise. Indeed, it was the victim of the fraud of Mike Rogers. CAV Farms kept books, recorded its corporate activities, filed tax returns and maintained insurance coverage. It properly conducted its

business activities as an entity separate from the other defendants. Snider Aff. par. 56, 57. If plaintiffs intend to press their piercing claim, disputed facts abound. This is not appropriate for determination on a motion for summary judgment.

V

PLAINTIFFS SHOULD BE DENIED
PRE-JUGDMENT INTEREST

The plaintiffs, under the circumstances, are not entitled to an award of pre-judgment interest. "The relative equities may make prejudgment interest inappropriate when the defendant acted innocently and had no reason to know of the wrongfulness of his actions…" Wickham Contracting Co. v. Local Union No. 3, 955 F.2d 831, 834 (2d Cir. 1992). That admonition certainly applies at bar.

"[T]he allowance of interest… [is] a matter for decision on equitable principles" (Cohen v Akabas & Cohen, 71 A.D.3d 419, 420 (N.Y.App.Div.1st Dept. 2010); see N.Y.C.P.L.R. 5001(a); Shubert v Lawrence, 27 A.D.2d 292, 297 (1967)). "[I]nterest is not a penalty," and is instead "the cost of having the use of another person's money for a specified period" (Love v State of New York, 78 NY2d 540, 544 (N.Y.App.Div.1st Dept. 1991). Requiring the defendants to pay interest at 9% per annum would amount to a penal sanction because it is much higher than the current market rate.

Moreover, even if the court were to find pre-judgment interest appropriate, the defendants should not be penalized for the plaintiffs' delay in commencing this action. The commencement of this action was the first notice by the plaintiffs to the defendants that they considered the defendants were liable. Snider Aff. par. 69. A party's delay in prosecuting an action is a factor a court may consider in exercising its discretion in equity to deny or reduce interest on that party's

claim. <u>Yagamo Acquisitions, LLC v. Baco Dev. 102 St. Inc.</u>, 718 N.Y.S.2d 325, 326 (N.Y.App.Div. 1st Dept. 2000).

WHEREFORE, Plaintiffs' motion for summary judgment should be denied.

Dated: October 6, 2020  
at Ithaca, New York

                                        EDWARD Y. CROSSMORE, ESQ.  
Special admission by Order  
dated September 10, 2018  
THE CROSSMORE LAW OFFICE  
Attorney for the Defendants  
Office and P.O. Address  
115 West Green Street  
Ithaca, New York 14850  
NYS Bar Roll No.: 103963  
Email: ruth@crossmore.com