## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EUGENE NICHOLAS, *et al.*,

      Plaintiffs,

      v.

JEFFREY SNIDER, *et al.*,

      Defendants.

No. 4:18-CV-01631

(Judge Brann)

## MEMORANDUM OPINION

### MARCH 9, 2021

## I.     BACKGROUND

This is a case about cattle contracts, where one party fulfilled its end of the bargain, and the other has failed to pay.  Through an intermediary named Michael Rogers, Plaintiffs sold hundreds of head of cattle to Defendants.  Defendants shorted Plaintiffs, refusing to pay, and claimed that Rogers was a ne'er do well, actually in the midst of defrauding *Defendants* through a sort of cattle-shifting Ponzi scheme.  Plaintiffs filed suit against Defendants in August 2018, seeking recovery through the Packers and Stockyards Act.[1]  In the alternative, Plaintiffs believe they are entitled to recovery based on a breach of contract or other equitable principles.  A First Amended Complaint was filed at the close of discovery and Defendants filed an Answer.  Plaintiffs have moved for summary

---

[1]   7 U.S.C. §§ 181 *et seq.*

judgment, which is now ripe for disposition; for the reasons that follow, it is granted.[2]

## II.    DISCUSSION

### A.    Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[3] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[5] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[6] "A plaintiff, on the other

---

[2]   Specifically, Plaintiffs are granted summary judgment on Counts 1-4. Because the Court finds that Plaintiffs are entitled to judgment on both their Packers and Stockyards claims and their breach of contract claims, I do not reach the equitable remedies they pursued in the alternative, and deny them as moot.

[3]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[4]   Fed. R. Civ. P. 56(a).

[5]   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[6]   *Clark*, 9 F.3d at 326.

hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[7]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[8]  Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[9] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[10]  "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[11] The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

---

[7]   *Id.*
[8]   *Liberty Lobby, Inc.*, 477 U.S. at 252.
[9]   *Id.*
[10]  *Id.*
[11]  *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[12]  "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[13]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[14]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[15]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would

---

[12]   *Celotex*, 477 U.S. at 323 (internal quotations omitted).
[13]   *Id*.
[14]   *Liberty Lobby*, 477 U.S. at 250.
[15]   Fed. R. Civ. P. 56(c)(1).

contradict the facts identified by the movant.'"[16]   Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[17]   On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[18]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[19]   "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[20]   "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[21]

### B.    Undisputed Facts

With that standard outlining the Court's framework for review, I now turn to the undisputed facts of this matter.

Plaintiffs Eugene Nicholas and Heidi Worden jointly do business through the entity Nicholas Farms, and Plaintiff Lynn Hottle does business as Hottle

---

[16]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co*., 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).
[17]   Fed. R. Civ. P. 56(e)(2).
[18]   Fed. R. Civ. P. 56(c)(3).
[19]   *Liberty Lobby*, 477 U.S. at 249.
[20]   *Id*.
[21]   *Id*. at 249–50 (internal citations omitted).

Livestock.[22]  Together, the Plaintiffs performed a series of cattle transactions with Michael Rogers, who owned approximately 47% of a limited liability company called Medio Cielo, LLC ("Medio").[23]  The rest of Defendant Medio was owned by a New York corporation named CAV Farms, Inc. ("CAV," and with Medio, the "Entity Defendants") – which owned approximately 53% of Medio.[24]  Defendant CAV, in turn, had one shareholder – the Snider Living Trust.[25]  Defendants Jeffrey and Valerie Snider are the trustees of the Snider Living Trust.[26]

Between January 2017 and August 2017, CAV had two contracts, which form the background of this dispute.[27]  First, CAV contracted with Fresh Direct, LLC ("Fresh Direct"), and agreed to provide it with cattle.[28]  In order to fulfill its obligations to Fresh Direct, CAV entered into a second contract: this time, with Medio.  Medio would find and procure the cattle for CAV.[29]  Serving as the "treasury" for the Entity Defendants, Jeffrey Snider managed their finances and records.[30]  From late 2016 until August 2017, the Entity Defendants acquired cattle from various sources and supplied them to third-party buyers as grass-fed finished beef.[31]  Michael Rogers worked as the middleman between the Entity Defendants

---

[22]   Doc. 76 ¶ 7; Doc. 79 ¶ 2.
[23]   Doc. 76 ¶ 18; Doc. 79 ¶ 8.
[24]   Doc. 76 ¶ 17; Doc. 79 ¶ 8.
[25]   Doc. 76 ¶ 16; Doc. 79 ¶ 7.
[26]   Doc. 76 ¶ 14; Doc. 79 ¶ 5.
[27]   Doc. 76 ¶ 19; Doc. 79 ¶ 8.
[28]   Doc. 76 ¶ 19; Doc. 79 ¶ 8.
[29]   Doc. 76 ¶ 19; Doc. 79 ¶ 8.
[30]   Doc. 76 ¶ 20; Doc. 79 ¶ 8.
[31]   Doc. 81 ¶ 16.

and their cattle sources, identifying opportunities to purchase cattle for the venture.[32]  Generally, Rogers would identify the cattle, negotiate the terms of the acquisition, pay for the cattle with his own funds, and then seek reimbursement from the Entity Defendants and Jeffrey Snider.[33]  Snider would not interact directly with the cattle sellers, leaving those engagements to Rogers.[34]

From December 2016 to July 2017, Plaintiffs and Rogers performed numerous cattle sale transactions.[35]  Plaintiffs claim that Rogers was acting as the Defendants' agent; Defendants disclaim all of Rogers's actions with regard to those transactions.

## C.    Analysis

### 1.    The Packers and Stockyards Act Claims

The "primary purpose" of the Packers and Stockyards Act (the "PSA") is to "assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry."[36]  Later amendments to the PSA attempted to eliminate delays between a livestock producer providing the product or services and receiving payment for them, because a producer still has operating expenses while awaiting payment.  Section 228b of the PSA states, in pertinent part, that each

---

[32]   *Id*. ¶ 31.
[33]   *Id*. ¶ 35-36.
[34]   *Id*. at ¶ 40.
[35]   Doc. 81 ¶¶ 70, 97; Doc. 85 ¶¶ 12, 25.
[36]   *Empire Kosher Poultry, Inc. v. Dep't of Agric.*, 475 Fed. Appx. 438, 441 (3d Cir. 2012) (quoting H.R.Rep. No. 85–1048, at 1 (1957), reprinted in 1958 U.S.C.C.A.N. 5212, 5213).

"packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price."[37]  The PSA defines a stockyard "dealer" as "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser."[38]  The term "person" encompasses "individuals, partnerships, corporations, and associations."[39]

Furthermore, Section 228b puts dealers on notice that any "delay or attempt to delay by a market agency, dealer, or packer purchasing livestock, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an 'unfair practice' in violation of this chapter."[40]  While parties may waive prompt payment, any agreement to that effect must be express, in writing, and made before the purchase or sale.[41]  Dealers may be held liable for the acts, omissions, or failures of their agents.[42]  And a person injured by an unfair practice is entitled to

---

[37]  7 U.S.C. § 228b.
[38]  7 U.S.C. § 201(d).
[39]  7 U.S.C. § 182(1).
[40]  7 U.S.C. § 228b(c).
[41]  7 U.S.C. § 228b(b).
[42]  7 U.S.C. § 223.

seek redress in federal court via the private right of action established in Section 209.[43]

Defendants raise two arguments in opposition to the motion for summary judgment. The first is that they are not "dealers" as defined by the PSA, and the second is that Michael Rogers was operating outside of his authority as an agent for CAV Farms. The Court addresses these issues in turn.

### a.   Defendants are "Dealers" Under the PSA[44]

Defendants' claim that they are not dealers under the PSA is both factually and legally unsupported. The First Amended Complaint alleged that Defendants "were in the business of buying and selling livestock in 'commerce' as defined in the [PSA]."[45] Defendants admitted this fact in their Answer to the First Amended Complaint.[46] In other words, Defendants admitted that they were "dealers" as defined by the PSA. For Defendants to turn around and now claim otherwise is inappropriate and does not create a genuine issue of material fact. While Plaintiffs raise this issue in their opening brief, plainly alerting Defendants to this fact,

---

[43]  7 U.S.C. § 209.

[44]  For reasons unclear to the Court (and seemingly, unclear to the Plaintiffs), Defendants' brief in opposition to the motion for summary judgment generally only makes references to actions taken by CAV, and not to Medio. Rather than deem the motion unopposed as to Medio, the Court construes the arguments as made in defense of all Defendants.

[45]  Doc. 76 ¶ 15.

[46]  Doc. 79 ¶ 6.

Defendants do not even address this admission in their opposition to summary judgment, and the Court sees no reason to credit an untenable position.[47]

Even putting Defendants' own admission aside, the record and law make clear that they acted as dealers.  In briefing, Defendants claim that CAV Farms bought cattle "not for a speculative resale, but to supply <u>one buyer</u>, Fresh Direct, that offered a firm price."[48]  This, they argue, puts them outside the categories of "persons" who other courts have found constitute a dealer.[49]  The court in *Solomon Valley Feedlot, Inc. v. Butz*, for example, distinguished between "one who is regulated because he is engaged in the business in accordance with the statute and one who makes profit as a result of improving the animals."[50]  Defendants suggest that CAV Farms falls into the second category, and therefore cannot be held liable. But the Court in *Solomon Valley Feedlot* was, as the name suggests, addressing the question of whether a *feedlot* – a "cattle feeder [that] makes it profit from feeding the cattle" – was a dealer under the statute.[51]  Solomon Valley Feedlot's ("Solomon") business model was originally that it would simply store and feed

---

[47]   *See* Doc. 82 at 16 n.3 ("Indeed, in their Answer to the First Amended Complaint, Defendants admitted that they were all 'in the business of buying and selling livestock in commerce as defined in the [PSA].'").

[48]   Doc. 85 at 3 (emphasis added).

[49]   *See Solomon Valley Feedlot, Inc. v. Butz*, 557 F.2d 717, 720 (10th Cir. 1977) ("[T]he three groups of people engaged in purchasing livestock as dealers include (1) packers-buyers who are employed by packing plants to acquire cattle for slaughter; (2) commission people such as order-buyers; and (3) speculators, who buy in their own name to resell.").

[50]   *Id*.

[51]   *Id*. at 719.

cattle for its customers.[52]  In other words, Solomon was just holding cattle and improving it until it reached a certain weight.  Eventually, Solomon expanded its services and assisted its customers in selling the cattle once the animals had attained the ideal weight.  The question before the Court was whether this new business activity made Solomon a dealer under the PSA.[53]

The district court had previously found that Solomon was not a dealer, because the assistance it provided to its customers was a "mere incident to the feeding business."[54]  The Tenth Circuit affirmed, noting that Solomon did not charge its "customer a fee for selling the cattle" and did not "receive[] the sale price from the packer."[55]  But in the instant action, the record indicates that any feeding by Defendants was actually incidental to the sale transactions with Fresh Direct.  The motivation to improve the animals was based on Defendants' need "[t]o meet Fresh Direct's supply requirements."[56]  Therefore, *Solomon Valley Feedlot* does not provide Defendants the support they seek, and does not create a genuine issue of material fact as to whether or not Defendants operated as dealers.

To the extent that Defendants attempt to escape the definition of dealer based on an argument that they purchased cattle "to supply one buyer" (Fresh

---

[52]  *Id*. at 718-19.
[53]  *Id*.
[54]  *Id*. at 719.
[55]  *Id*. at 720.
[56]  Doc. 83 ¶ 38.

Direct), this claim is contradicted by the record.[57]  During his 30(b)(6) deposition, Jeffrey Snider admitted that there were other private transactions, "unrelated to the Fresh Direct program" where they "sold, through a private treaty, a lot of conventional cattle."[58]  The record indicates that Fresh Direct was not Defendants' only buyer.  Therefore, any legal distinction that Defendants might try to draw is simply inapplicable to the facts of this case.  Snider's "conclusory, self-serving affidavit[]" created more than a year after his deposition, cannot create a genuine issue of material fact with his deposition testimony by itself, largely because it points to no "specific facts" that could defeat summary judgment.[59]

Likewise, Defendants' half-hearted effort to distinguish *Abingdon Livestock Exchange v. Smith* is unsuccessful.[60]  To start, it is not entirely clear on what grounds Defendants challenge Plaintiffs' interpretation of that case.  In any event, that court's findings are helpful to the resolution of this matter.  Here, as in *Abingdon*, "[t]here is no question that the essence of the defendants' business was buying large quantities of cattle from various sources for resale. The fact that most of the cattle were not resold immediately, but only after the cattle had been fed for a few months at commercial feed lots, does not change the defendants' proper

---

[57]  Doc. 85 at 3.

[58]  Doc. 86 Ex. 4 (Snider Deposition Tr. 55:12-25).

[59]  *Paladino v. Newsome*, 885 F.3d 203, 208-09 (3d Cir. 2018).

[60]  594 F.Supp.2d 688 (W.D. Va. 2009).  Defendants' brief spends only one sentence analyzing this topic, and also includes a one-sentence quote from *Abington*.

statutory characterization as 'dealers.'"[61]  Again, the record indicates that Defendants' business model was much closer to a reseller than a feedlot, and therefore are properly labeled "dealers" under the PSA.

Finally, Defendants note that farmers and ranchers are not liable under the PSA "when buying livestock for their own stocking or feeding purposes, or when marketing their own livestock."  Then, they baldly assert that the question of whether CAV Farms acted as a dealer or a farmer is a matter for a jury.  I disagree. Simply claiming that something is a jury question does not make it so.  Defendants point to nothing in the record to even suggest that CAV Farms was a farmer.  This unsupported allegation cannot create a genuine dispute of material fact.

It is clear from both Defendants' own Answer to the First Amended Complaint and the rest of the record that CAV, Medio, and the Sniders operated as dealers.  There is no genuine dispute over this.  The Court finds that Defendants were dealers subject to liability under the PSA.

### b.   Michael Rogers's Actions

Next, the Court considers whether Defendants are liable for the actions of Michael Rogers.  As discussed above, the PSA imposes liability on principals for the actions of their agents.  Plaintiffs have established that Rogers was a minority member of Medio and was responsible for acquiring cattle for CAV Farms and

---

[61]   *Abingdon*, 594 F.Supp.2d at 695.

Medio.[62]  Rogers would advance payment on behalf of Defendants in order to acquire cattle, and Defendants would then reimburse Rogers.

Defendants do not contest that Rogers was their agent during the relevant time.  Instead, they claim that Rogers was not *acting* as their agent during the transactions at issue, because those transactions were conducted to "cover the fraud he practiced on CAV Farms."[63]  As such, they claim that Rogers acted outside of his authority.  Plaintiffs counter that Rogers had implied actual authority to conduct the business of purchasing cattle for Defendants.

Agency doctrine is based in state law and the parties agree that New York agency law governs.  Under New York law, an agent can have actual or apparent authority.[64]  Plaintiffs do not pursue an apparent authority theory, but rather assert that Rogers had actual authority.  Actual authority can be either express or implied.[65]  Whether Rogers was expressly authorized to engage in the transactions at issue may well be disputed.  Therefore, Plaintiffs say that Rogers had implied authority.  "The general rule in New York with regard to implied authority is that an agent employed to do an act is deemed authorized to do it in the manner in which business entrusted to him is usually done."[66]

---

[62]

[63]  Doc. 85 at 4.

[64]  *Precedo Capital Group Inc. v. Twitter Inc.*, 33 F.Supp.3d 245, 253-54 (S.D.N.Y. 2014).

[65]  *Id.*

[66]  *Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F.Supp. 912, 919 (S.D.N.Y. 1984).

Plaintiffs point to uncontested evidence in the record that Rogers was authorized to "look for cattle for sale from farmers/livestock dealers" and that he would communicate with sellers without maintaining records of his agreements with those sellers.[67]  Crucially, Defendants did not dispute that Rogers would sometimes acquire "cattle on behalf of the CAV-Medio venture without consulting Defendant Jeffrey Snider in advance, expecting to be reimbursed later."[68]  Finally, Defendants also did not dispute Plaintiffs' evidence that Snider and the Entity Defendants "relied on Rogers for information about the cattle he acquired" without confirming the accuracy of that information.[69]

Defendants' arguments that Rogers acted outside the scope of his authority fall flat for several reasons.  First, Defendants' actions show that they implicitly authorized Rogers to act in the manner which he did.  Second, Defendants are mistaken in their claim that Plaintiffs had to undertake an investigation to discover the actual scope of Rogers's authority.  Third, even assuming that Rogers had perpetrated any fraud on Defendants, that does not preclude summary judgment.

Defendants' argument is as follows: "The plaintiffs claim Mike Rogers had implicit authority to purchase and purchase on credit, binding CAV Farms.  CAV Farms asserts he did not.  This presents an issue of fact that is not properly determined on a summary judgment motion."  Once again, Defendants rely on

---

[67]  Doc. 81 ¶¶ 31-32.
[68]  *Id*. ¶ 37.
[69]  *Id*. ¶ 39-40.

unsupported conclusions.  A genuine dispute of material fact does not exist simply because one party repeats the claim like a mantra.  On the contrary, Plaintiffs have shown that the transactions Rogers entered into with Plaintiffs were similar to ones he had entered into on Defendants' behalf in the past, where he had acquired cattle using his own funds, and without discussing the agreement with Snider ahead of time.[70]

Defendants cannot now claim that this transaction was so unusual or unique as to sever the link between them and Rogers.  They have pointed to no facts in the record showing that they enforced any of their supposed checks and balances to prevent a fraud from occurring.  Rogers was their middleman and acquired cattle on their behalf.  The details of the structure for payment were clearly underregulated by Defendants, but the fact that they regret that shortcoming in their business dealings does not change the relationship between Rogers and Defendants.  By allowing him to conduct business in the way he did, Defendants implicitly authorized Rogers to continue to do so.

Defendants' next argument also falters because apparent authority and actual authority are subject to different rules and limitations.  Defendants claim that simply because Rogers was acting on behalf of a principal (Defendants themselves), his actions imposed a duty on Plaintiffs to determine the exact scope

---

[70]  Doc. 81 Ex. 14 (Rogers Tr. 163:3-5) (Q: "All right.  So there were times that you purchased cattle without ever consulting Jeff?" A: "Yes.").

of Rogers's authority.  Defendants rely on *Property Advisory Group, Inc. v. Bevona* for this proposition.  That case noted that a party "who deals with an agent does so at his peril, and must make necessary effort to discover the actual scope of the agent's authority.  A party claiming reliance on an agent's <u>apparent authority</u> must not fail to heed warnings or inconsistent circumstances."[71]

The duty to inquire is long-established in New York agency law.  That duty, however, is not in fact an affirmative one.  It does not require that a party embark on an investigation into the precise contours and boundaries of an agent's authority.  Rather, in the context of actual authority, "[i]t means only that the party who fails to inquire takes the risk that the putative agent does not have actual authority."[72]

The duty to inquire takes on a somewhat more robust role in the context of apparent authority, but even there, that duty is a rather limited one.  As the United States Court of Appeals for the Second Circuit has said about apparent authority, "the duty to inquire only arises when the facts and circumstances are such as to put

---

[71]   718 F.Supp. 209, 213 (S.D.N.Y. 1989) (emphasis added).

[72]   LITIGATION CONSIDERATIONS: PROVING AN AGENCY – DUTY OF INQUIRY, 4D N.Y. Prac., Com. Litig. in New York State Courts § 102:18 (5th ed.).  *See also BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F.Supp.2d 123, 131 n. 3 (S.D.N.Y. 1999) ("In stating that a party contracting with an agent has a duty to inquire in certain circumstances, the Second Circuit explicitly indicated that this applied in the apparent authority context.") (internal alterations and quotation marks omitted).

him on inquiry, the transaction is extraordinary, or the novelty of the transaction alerts the third party to the danger of fraud."[73]

The problem with Defendants' line of reasoning is that Plaintiffs do not rely on Rogers's <u>apparent authority</u>; as Defendants acknowledge, Plaintiffs rely exclusively on his <u>actual authority</u>.  The duty to inquire has no bearing on a party's responsibility in dealing with an agent when that party invokes the doctrine of actual authority.  Defendants' attempt to create an additional burden for Plaintiffs is unavailing.  And even if Plaintiffs were relying on apparent authority, Defendants have not created a record which would support a finding that the transactions at issue were so extraordinary or novel.

### c.   Jeffrey Snider's Individual Liability

Defendants' brief in opposition to the motion for summary judgment does not attempt to refute Plaintiffs' position that Snider may be held individually liable for the Entity Defendants' violations of the PSA.  Therefore, the motion is deemed unopposed as to that issue.  Additionally, other courts have recognized that "[a]ny 'person' who is a 'dealer' is subject to the provisions of the PSA—no piercing of the corporate veil is necessary for that individual to be subject to liability."[74] Unlike Plaintiffs' breach of contract claim, there is no need to discuss here whether the corporate veil protects Jeffrey Snider from liability under the PSA as a dealer.

---

[73] *Herbert Const. Co. v. Continental Ins. Co.*, 931 F.2d 989, 996 (2d Cir. 1991) (interpreting New York law) (cleaned up).

[74] *Tison Hog Market, Inc. v. Paulk*, 1997 WL 34637589 (S.D. Ga. Dec. 8, 1997).

Snider is liable as a dealer, given the corporate structures and closely-held natures of the Entity Defendants, as well as his role in managing the venture and the admission made in Defendants' Answer.[75]

### d.   Damages

Having established that Plaintiffs are entitled to summary judgment on their PSA claims, the Court turns to the question of damages.  Plaintiffs assert that they are entitled to the outstanding balance due on their cattle transactions, as well as pre-judgment interest.  Under the PSA, a defendant is "liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation."[76]

Defendants' opposition does not dispute Plaintiffs' calculation as to the outstanding balance due on the transactions but does argue that Plaintiffs should not receive prejudgment interest.  To be clear, Defendants' position is based on arguments sounding in equity, and they do not contest Plaintiffs' interpretation of the law, or the applicability of the relevant statutes.  Defendants' points, while thoughtful, do not justify denying Plaintiffs that which Congress has determined they are entitled to.  As this Court held more than forty years ago, "Congress intended that the 'full payment' includes the principal amount (purchase price), prejudgment interest on that amount from the date following the delivery and

---

[75]   *Fillippo v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1008, 1016 (E.D. Pa. 1978).
[76]   7 U.S.C. § 209(a).

acceptance of the livestock, and costs incurred by the suppliers in seeking to enforce their rights."[77]  None of the cases Defendants lean on mandate a different result after Congress has spoken.

Defendants also claim that Plaintiffs should be denied prejudgment interest because they delayed in bringing this action.  The transactions at issue took place between December 2016 and July 2017.  This action was filed in August 2018. Defendants represent to this Court that the first notice they received from Plaintiffs "that they considered the defendants were liable" was the "commencement of this action."  But as Plaintiffs point out, Valerie Snider admitted during her deposition that Plaintiffs raised the issue of unpaid cattle transactions in October 2017, almost one year earlier.[78]  Regardless, any delay by Plaintiffs in bringing this action does not countenance action contrary to the PSA's requirements.

Furthermore, Plaintiffs' proposed 9% interest rate is also mandated by statute.  New York law controls the rate of prejudgment interest, and requires that it be paid "at the rate of nine per centum per annum, except where otherwise provided by statute."[79]  While Defendants argue that such a high rate would be "penal," this Court cannot ignore clear statutory language.  Because Defendants provide no other argument to support their plea for a lower interest rate, that

---

[77] *Pennsylvania Agr. Co-op. Marketing Ass'n v. Ezra Martin Co.*, 495 F.Supp. 565, 570-71 (M.D. Pa. 1980) (Herman, J.).
[78] *See* Doc. 86 Ex. 2; 3.
[79] NY CLPR § 5004.

request is denied.  Finally, Plaintiffs suggest that the interest on damages to Hottle

Livestock be calculated from August 3, 2017.[80]  They also recommend that interest

owed to Nicholas Farms be calculated from July 25, 2017.[81]

## 2.    Breach of Contract Claims

Plaintiffs' next claims are for breach of contract.  Defendants' only point in

opposition to the breach of contract claim stemmed from its argument regarding

Rogers's authority as an agent.  Having already determined that Rogers was

Defendants' agent, and that he acted within his authority, a large portion of the

analysis for this claim is done.  But in the interest of developing a more complete

record for the parties, I set forth the appropriate standard for these claims.

The parties do not dispute that under Pennsylvania's choice of law rules, the

analysis for this breach of contract claim is the same whether the Court applies

Pennsylvania or New York contract law.  If "two jurisdictions' laws are the same,

then there is no conflict at all, and a choice of law analysis is unnecessary."[82]

Thus, "if there are no relevant differences between the laws of the two states, or the

laws would produce the same result . . . the court does not have to engage in a

choice of law analysis, and may refer to the states' laws interchangeably."[83]

---

[80]   Doc. 82 at 17 n. 4.
[81]   *Id*. at 18 n. 7.
[82]   *Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, 2016 WL 4502456 at *3 (M.D. Pa. Aug. 29, 2016) (quoting *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007)).
[83]   *Id*.

In Pennsylvania, a claim for breach of contract must establish three elements: (1) the existence of a contract that includes its essential terms; (2) a breach of that contract; and (3) damages resulting from the breach.[84]   Defendants' statement of disputed facts does not deny that contracts were formed; instead, they repeatedly claim that "Rogers was not acting on behalf of Defendant[s] during the sales alleged by Plaintiffs" or that Defendants were "not a party to said agreement."[85]   As this Court has held, *supra*, Defendants are liable for the actions of their agent, Michael Rogers.   The failure to provide complete payment for the cattle constitutes breach of contract, and no one disputes that Plaintiffs suffered damages.

The analysis for damages in this breach of contract action is similar to the calculation under the PSA.   Both Pennsylvania and New York allow plaintiffs to recover prejudgment interest for breach of contract claims.[86]   Because the "place of delivery of goods is often considered the place of performance," and the cattle were delivered in New York,[87] the New York prejudgment interest rate (9%) applies.[88]   The calculation for damages appears to be the same as under the PSA.

---

[84]   *Silva v. Rite Aid Corp.*, 416 F.Supp.3d 394, 401 (M.D. Pa. 2019).

[85]   *See* Doc. 84 Ex. 2 ¶¶ 12-20.

[86]   *See* NY CPLR 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property . . ."); *TIG Ins. Co. v. Tyco Intern. Ltd.*, 919 F.Supp.2d 439, 473-74 (M.D. Pa. 2013) ("Under Pennsylvania law, prejudgment interest is awardable as a matter of right in contract actions.").

[87]   *See* Doc. 82 at 31 n. 10.

[88]   *Lutheran Home for the Aged v. Forest River, Inc.*, 2020 WL 2950025 (W.D. Pa. May 1, 2020).

### a.   Piercing the Corporate Veil is Warranted

Plaintiffs also ask this Court to pierce the corporate veil and permit recovery directly from Jeffrey Snider.  That request is granted.  When considering corporate law issues, Pennsylvania's choice of law rules dictate that "the law of the state of incorporation" applies.[89]  Therefore, I consider whether, under New York law, piercing the corporate veil is appropriate.

"Under New York law, a party seeking to pierce the corporate veil must generally show that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[90]  New York courts would generally utilize the factors outlined in *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the

---

[89]   *Milton Roy, LLC v. Northeast Pump & Instrument, Inc.*, 2019 WL 2469795 at *5 n.9 (W.D. Pa. June 13, 2019).

[90]   *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508 (S.D.N.Y. 2005).

group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.[91]

Cases alleging domination by an individual (as opposed to another corporation) logically focus on the first four factors, as well as the sixth.  Plaintiffs have provided ample evidence that Jeffrey Snider dominated the Entity Defendants.  The Entity Defendants were closely-held corporations.  Medio was owned by CAV.  CAV was owned by the Jeffrey and Valerie Snider Living Trust.  Snider kept one transaction ledger for both CAV and Medio, indicating an absence of formalities.[92]  Additionally, personal and corporate funds were clearly commingled.  For example, during his deposition, Snider testified that he would reimburse Rogers's cattle purchases "from whatever source was available that was timely."[93]

Defendants' opposition brief does not directly attempt to dispute that Jeffrey Snider dominated the Entity Defendants.  Instead, Defendants claim that piercing the corporate veil would be unjustified because "CAV Farms engaged in no fraudulent activities" and that it "kept books, recorded its corporate activities, filed tax returns and maintained insurance coverage."  Defendants also state that CAV "properly conducted its business activities as an entity separate from the other defendants."[94]

---

[91]   933 F.2d 131 (2d Cir. 1991).
[92]   Doc. 81 ¶ 19.
[93]   Doc. 81 Ex. 6 (Snider Tr. 141:3-4).
[94]   Doc. 86 at 10-11.

But again, the record is clear that corporate and personal funds were commingled.  Indeed, the only citation Defendants make to the record on this issue contradicts the claim made in briefing.[95]  Paragraph 56 of Jeffrey Snider's affidavit catalogs the different bank accounts used.[96]  One of those accounts was an American Express account ending with 4003.  Mr. Snider described that account as follows: "Personal AMEX account used for business and personal activity.  Some CAV or Medio Cielo charges."[97]  As Plaintiffs correctly note, Snider's affidavit actually confirms that funds were inappropriately commingled.

Plaintiffs' brief and statement of facts outline a careful effort by Jeffrey Snider to liquidate the assets of the Entity Defendants once they learned that Fresh Direct was severing ties with them.[98]  This evidence establishes the second requirement, that Defendants caused Plaintiffs harm.  By May 2019, CAV was left with approximately $13,000 in its two bank accounts, and Medio had less than $1,500.[99]  In the two weeks following Fresh Direct's termination notice in August 2017, the Sniders transferred more than $350,000 from the entity Defendants' accounts to their own.[100]  Almost all of those transactions are conspicuously absent

---

[95]  *Id*.

[96]  Doc. 83 ¶ 56.

[97]  *Id*.

[98]  Doc. 82 at 36.

[99]  Doc. 81 ¶ 158.

[100]  *Id*. ¶ 160.

from Snider's transaction ledger.[101]  The result of these actions was that the entity Defendants became judgment-proof.

To be clear, Defendants have not denied *any* of these facts in either their brief or their statement of disputed facts.[102]  Putting aside whether Jeffrey's Sniders actions constitute a fraud under the second prong of the analysis, New York law is clear that "the diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced," even at the summary judgment stage[103]  "If a corporation is not able to pay its debts to the plaintiff as a result of the owner's domination that is an inequitable consequence sufficient to meet the fraud or wrong prong."[104]

Defendants' cursory claim that if Plaintiffs "intend to press their piercing claim, disputed facts abound," is unsupported, and in fact, contradicted by the record.  Summary judgment is appropriate in this case.

---

[101]  *Id*. ¶ 162.

[102]  *See* Doc. 84 Ex. 2; Doc. 85.

[103]  *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F.Supp.2d 461, 476 (S.D.N.Y. 2005) (piercing the corporate veil and granting summary judgment).

[104]  *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F.Supp.2d 361, 378 (E.D.N.Y. 2013).

## III.   CONCLUSION

Plaintiffs' motion for summary judgment is granted as to Counts 1-4.

Summary judgment is denied as moot as to Count 5 and 6.  Plaintiffs are awarded

damages as follows:

1.   Plaintiff Hottle Livestock is entitled to $336,003.25, plus prejudgment

interest, calculated at the New York statutory rate of 9% per annum.

2.   Plaintiff Nicholas Farms is entitled to $225,114.75, plus prejudgment

interest, calculated at the New York statutory rate of 9% per annum.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge